**PENNSY SUPPLY, INC., Appellant**

v.

**AMERICAN ASH RECYCLING CORP. of Pennsylvania, Appellee.**

Superior Court of Pennsylvania.

Argued Nov. 30, 2005.
Filed March 17, 2006.
Reargument Denied May 23, 2006.

David A. Flores, Lancaster, for appellant.

David A. Fitzsimmons, Carlisle, for appellee.

BEFORE: JOYCE, ORIE MELVIN and TAMILIA, JJ.

OPINION BY ORIE MELVIN, J.:

¶ 1 Appellant, Pennsy Supply, Inc. ("Pennsy"), appeals from the grant of preliminary objections in the nature of a demurrer in favor of Appellee, American Ash Recycling Corp. of Pennsylvania ("American Ash"). We reverse and remand for further proceedings.

¶ 2 The trial court summarized the allegations of the complaint as follows:

The instant case arises out of a construction project for Northern York High School (Project) owned by Northern York County School District (District) in York County, Pennsylvania. The District entered into a construction contract for the Project with a general contractor, Lobar, Inc. (Lobar). Lobar, in turn, subcontracted the paving of driveways and a parking lot to [Pennsy]. The contract between Lobar and the District included Project Specifications for paving work which required Lobar, through its subcontractor Pennsy, to use certain base aggregates. The Project Specifications permitted substitution of the aggregates with an alternate material known as Treated Ash Aggregate (TAA) or AggRite.

The Project Specifications included a 'notice to bidders' of the availability of AggRite at no cost from [American Ash], a supplier of AggRite. The Project Specifications also included a letter to the Project architect from American Ash confirming the availability of a certain amount of free AggRite on a first come, first served basis.

Pennsy contacted American Ash and informed American Ash that it would require approximately 11,000 tons of AggRite for the Project. Pennsy subsequently picked up the AggRite from American Ash and used it for the paving work, in accordance with the Project Specifications.

Pennsy completed the paving work in December 2001. The pavement ultimately developed extensive cracking in February 2002. The District notified ... Lobar[ ] as to the defects and Lobar in turn directed Pennsy to remedy the defective work. Pennsy performed the remedial work during summer 2003 at no cost to the District.

The scope and cost of the remedial work included the removal and appropriate disposal of the AggRite, which is classified as a hazardous waste material by the Pennsylvania Department of Environmental Protection. Pennsy requested American Ash to arrange for the removal and disposal of the AggRite;

however, American Ash did not do so. Pennsy provided notice to American Ash of its intention to recover costs.

Trial Court Opinion, 5/27/05, at 1–3 (footnote omitted). Pennsy also alleged that the remedial work cost it $251,940.20 to perform and that it expended an additional $133,777.48 to dispose of the AggRite it removed. Compl. ¶¶ 26, 29.

¶ 3 On November 18, 2004, Pennsy filed a five-count complaint against American Ash alleging breach of contract (Count I); breach of implied warranty of merchantability (Count II); breach of express warranty of merchantability (Count III); breach of warranty of fitness for a particular purpose (Count IV); and promissory estoppel (Count V).[1] American Ash filed demurrers to all five counts. Pennsy responded and also sought leave to amend should any demurrer be sustained. The trial court sustained the demurrers by order and opinion dated May 25, 2005 and dismissed the complaint. This appeal followed.[2]

¶ 4 Pennsy raises three questions for our review:

(1) Whether the trial court erred in not accepting as true ... [the] Complaint allegations that (a) [American Ash] promotes the use of its AggRite material, which is classified as hazardous waste, in order to avoid the high cost of disposing [of] the material itself; and (b) [American Ash] incurred a benefit from Pennsy's use of the material in the form of avoidance of the costs of said disposal sufficient to ground contract and warranty claims.

(2) Whether Pennsy's relief of [American Ash's] legal obligation to dispose of a material classified as hazardous waste, such that [American Ash] avoided the costs of disposal thereof at a hazardous waste site, is sufficient consideration to ground contract and warranty claims.

(3) Whether the trial court misconstrued the well-pled facts of the Complaint in dismissing Pennsy's promissory estoppel claim because Pennsy, according to the court, did not receive [American Ash's] product specifications until after the paving was completed, which was not pled and is not factual.

Appellant's Brief at 3.

¶ 5 "Preliminary objections in the nature of a demurrer test the legal sufficiency of the complaint." *Hospodar v. Schick,* 885 A.2d 986, 988 (Pa.Super.2005).

When reviewing the dismissal of a complaint based upon preliminary objections in the nature of a demurrer, we treat as true all well-pleaded material, factual averments and all inferences fairly deducible therefrom. Where the preliminary objections will result in the dismissal of the action, the objections may be sustained only in cases that are clear and free from doubt. To be clear and free from doubt that dismissal is appropriate, it must appear with certainty that the law would not permit recovery by the plaintiff upon the facts averred. Any doubt should be resolved by a refusal to sustain the objections. Moreover, we review the trial court's decision for an abuse of discretion or an error of law.

---

1. The warranty claims were premised upon 13 Pa.C.S.A. §§ 2314 (Count II), 2313 (Count III), and 2315 (Count IV).

2. At the trial court's direction, Pennsy filed a concise statement of matters complained of on appeal pursuant to Pa.R.A.P.1925(b) preserving the issues now raised on appeal. By order dated June 29, 2005, the trial court indicated it would rely on its May 25, 2005 opinion.

*Id.* In applying this standard to the instant appeal, we deem it easiest to order our discussion by count.

¶ 6 Count I raises a breach of contract claim. "A cause of action for breach of contract must be established by pleading (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." *Corestates Bank, N.A. v. Cutillo,* 723 A.2d 1053, 1058 (Pa.Super.1999). While not every term of a contract must be stated in complete detail, every element must be specifically pleaded. *Id.* at 1058. Clarity is particularly important where an oral contract is alleged. *Snaith v. Snaith,* 282 Pa.Super. 450, 422 A.2d 1379, 1382 (1980).

¶ 7 Instantly, the trial court determined that "any alleged agreement between the parties is unenforceable for lack of consideration." Trial Court Opinion, 5/27/05, at 5. The trial court also stated "the facts as pleaded do not support an inference that disposal costs were part of any bargaining process *or* that American Ash offered the AggRite with an intent to avoid disposal costs." *Id.* at 7 (emphasis added). Thus, we understand the trial court to have dismissed Count I for two reasons related to the necessary element of consideration: one, the allegations of the Complaint established that Pennsy had received a conditional gift from American Ash, *see id.* 6, 8, and, two, there were no allegations in the Complaint to show that American Ash's avoidance of disposal costs was part of any bargaining process between the parties. *See id.* at 7.[3]

¶ 8 It is axiomatic that consideration is "an essential element of an enforceable contract." *Stelmack v. Glen Alden Coal Co.,* 339 Pa. 410, 414–415, 14 A.2d 127, 128 (1940). *See also Weavertown Transport Leasing, Inc. v. Moran,* 834 A.2d 1169, 1172 (Pa.Super.2003) (stating, "[a] contract is formed when the parties to it (1) reach a mutual understanding, (2) exchange consideration, and (3) delineate the terms of their bargain with sufficient clarity."). "Consideration consists of a benefit to the promisor or a detriment to the promisee." *Weavertown,* 834 A.2d at 1172 (citing *Stelmack*). "Consideration must actually be bargained for as the exchange for the promise." *Stelmack,* 339 Pa. at 414, 14 A.2d at 129.

It is not enough, however, that the promisee has suffered a legal detriment at the request of the promisor. The detriment incurred must be the 'quid pro quo', or the 'price' of the promise, and the inducement for which it was made.... If the promisor merely intends to make a gift to the promisee upon the performance of a condition, the promise is gratuitous and the satisfaction of the condition is not consideration for a contract. The distinction between such a conditional gift and a contract is well illustrated in Williston on Contracts, Rev.Ed., Vol. 1, Section 112, where it is said: 'If a benevolent man says to a tramp,-'If you go around the corner to the clothing shop there, you may purchase an overcoat on my credit,' no reasonable person would understand that the short walk was requested as the consideration for the promise, but that

---

**3.** To the extent the trial court may also be understood to have dismissed Count I for failure to plead a contract with the requisite specificity, *see* Trial Court Opinion, 5/27/05, at 7–8, we disagree. Paragraphs ¶¶ 9–10, and 16 of the Complaint allege the required elements of a contract claim. Critically, paragraph 10 alleges American Ash was to furnish AggRite "for use on the Project in accordance with the Project Specifications," thereby identifying the oral contract's essential term, later alleged in paragraph 16 to have been breached.

in the event of the tramp going to the shop the promisor would make him a gift.'

*Weavertown*, 834 A.2d at 1172 (quoting *Stelmack*, 339 Pa. at 414, 14 A.2d at 128–29). Whether a contract is supported by consideration presents a question of law. *Davis & Warde, Inc. v. Tripodi*, 420 Pa.Super. 450, 616 A.2d 1384 (1992).

■ ¶ 9 The classic formula for the difficult concept of consideration was stated by Justice Oliver Wendell Holmes, Jr. as "the promise must induce the detriment and the detriment must induce the promise." John Edward Murray, Jr., MURRAY ON CONTRACTS § 60 (3d. ed.1990), at 227 (citing *Wisconsin & Michigan Ry. v. Powers*, 191 U.S. 379, 24 S.Ct. 107, 48 L.Ed. 229 (1903)). As explained by Professor Murray:

> If the promisor made the promise for the purpose of inducing the detriment, the detriment induced the promise. *If, however, the promisor made the promise with no particular interest in the detriment that the promisee had to suffer to take advantage of the promised gift or other benefit, the detriment was incidental or conditional to the promisee's receipt of the benefit.* Even though the promisee suffered a detriment induced by the promise, the purpose of the promisor was not to have the promisee suffer the detriment because she did not seek that detriment in exchange for her promise.

*Id.* § 60.C, at 230 (emphasis added). This concept is also well summarized in AMERICAN JURISPRUDENCE:

> As to the distinction between consideration and a condition, it is often difficult to determine whether words of condition in a promise indicate a request for consideration or state a mere condition in a gratuitous promise. An aid, though not a conclusive test, in determining which

construction of the promise is more reasonable is an inquiry into *whether the occurrence of the condition would benefit the promisor. If so, it is a fair inference that the occurrence was requested as consideration.* On the other hand, if the occurrence of the condition is no benefit to the promisor but is merely to enable the promisee to receive a gift, the occurrence of the event on which the promise is conditional, though brought about by the promisee in reliance on the promise, is not properly construed as consideration.

17A AM. JUR.2d § 104 (2004 & 2005 Supp.) (emphasis added). *See also* Restatement (Second) of Contracts § 71 comment c (noting "the distinction between bargain and gift may be a fine one, depending on the motives manifested by the parties"); *Carlisle v. T & R Excavating, Inc.*, 123 Ohio App.3d 277, 704 N.E.2d 39 (1997) (discussing the difference between consideration and a conditional gift and finding no consideration where promisor who promised to do excavating work for preschool being built by ex-wife would receive no benefit from wife's reimbursement of his material costs).

■ ¶ 10 Upon review, we disagree with the trial court that the allegations of the Complaint show only that American Ash made a conditional gift of the AggRite to Pennsy. In paragraphs 8 and 9 of the Complaint, Pennsy alleged:

> American Ash actively promotes the use of AggRite as a building material to be used in base course of paved structures, and provides the material free of charge, in an effort to have others dispose of the material and thereby avoid incurring the disposal costs itself ... American Ash provided the AggRite to Pennsy for use on the Project, which saved American Ash thousands of dollars in disposal costs it otherwise would have incurred.

Compl. ¶¶ 8, 9. Accepting these allegations as true and using the Holmesian formula for consideration, it is a fair interpretation of the Complaint that American Ash's promise to supply AggRite free of charge induced Pennsy to assume the detriment of collecting and taking title to the material, and critically, that it was this very detriment, whether assumed by Pennsy or some other successful bidder to the paving subcontract, which induced American Ash to make the promise to provide free AggRite for the project. Paragraphs 8–9 of the Complaint simply belie the notion that American Ash offered AggRite as a conditional gift to the successful bidder on the paving subcontract for which American Ash desired and expected nothing in return.[4]

¶ 11 We turn now to whether consideration is lacking because Pennsy did not allege that American Ash's avoidance of disposal costs was part of any bargaining process between the parties. The Complaint does not allege that the parties discussed or even that Pennsy understood at the time it requested or accepted the AggRite that Pennsy's use of the AggRite would allow American Ash to avoid disposal costs.[5] However, we do not believe such is necessary.

> The bargain theory of consideration does not actually require that the parties bargain over the terms of the agreement. . . . According to Holmes, an influential advocate of the bargain theory, what is required [for consideration to exist] is that the promise and the consideration be in 'the relation of reciprocal conventional inducement, each for the other.'

E. Allen Farnsworth, FARNSWORTH ON CONTRACTS § 2.6 (1990) (citing O. Holmes, THE COMMON LAW 293–94 (1881)); *see also* Restatement (Second) of Contracts § 71 (defining "bargained for" in terms of the Holmesian formula). Here, as explained above, the Complaint alleges facts which, if proven, would show the promise induced the detriment and the detriment induced the promise. This would be consideration. Accordingly, we reverse the dismissal of Count I.

¶ 12 Counts II, III and IV alleged breach of warranty claims under Article 2 of the Uniform Commercial Code ("UCC"). The trial court dismissed these counts as a group upon concluding the facts alleged failed to show a contract for the "sale of goods" as required to trigger application of UCC Article 2. Trial Court Opinion, 5/27/05, at 8 (concluding, "the transaction as pleaded, by which American Ash gave Pennsy free AggRite, amounted to a conditional gift, not a contract of sale"). Again, we disagree that the allegations reveal a transaction that can only be characterized as a conditional gift. We turn now to whether the allegations otherwise trigger application of Article 2.

---

4. We understand the contract between Lobar and the District required Lobar to use certain specified base aggregates and permitted the substitution of AggRite for those aggregates. Realistically, however, it is a fair inference from this Complaint that the successful bidder on the paving subcontract could not have used anything other than the free material authorized by Lobar's contract with the District.

5. Pennsy's complaint, by placing the allegation in ¶ 8 that American Ash promotes AggRite and provides it free of charge, before the allegations in ¶¶ 9–10 related to formation of the oral contract, is arguably structured to suggest Pennsy did contemplate American Ash's avoidance of disposal costs. We note also that during oral argument on the preliminary objections, Pennsy's counsel represented "it was understood by everybody that this [i.e., avoidance of disposal costs] was what American Ash was getting in return for [providing the AggRite for free]." Transcript of Proceedings, Feb. 1, 2005, at 14–15.

¶ 13 Article 2 applies to "transactions in goods." 13 Pa.C.S.A. § 2102. AggRite is obviously a good. *See* 13 Pa. C.S.A. § 2105 (defining "goods" as "all things (including specially manufactured goods) which are moveable at the time of identification to the contract."). Before the protections of the Article 2 warranties apply, "there must be a sale of goods." *Turney Media Fuel, Inc. v. Toll Bros., Inc.,* 725 A.2d 836, 840 (Pa.Super.1999). *See also Whitmer v. Bell Tele. Co. of Pennsylvania,* 361 Pa.Super. 282, 522 A.2d 584, 588 (1987) (stating, "[a] prerequisite to an action for breach of warranty [under Article 2] is that there must be a *sale.*") (quoting *Williams v. West Penn Power Co.,* 313 Pa.Super. 461, 460 A.2d 278, 281 (1983), *modified,* 502 Pa. 557, 467 A.2d 811 (1983)).

¶ 14 "A sale [under Article 2] consists in the passing of title from the seller to the buyer for a price." 13 Pa.C.S.A. § 2106 (parenthetical reference omitted).[6] Section 2–304, entitled "Price payable in money, goods, realty or otherwise," provides in subsection (a) that as a general rule "[t]he price can be made payable in money or otherwise." 13 Pa.C.S.A. § 2304. Pennsy argues that its acquisition of the AggRite whereby American Ash was relieved of disposal costs can constitute a price within the meaning of the "or otherwise" language in 13 Pa.C.S.A. § 2304. We agree. The few courts to have interpreted the "or otherwise" language of a UCC provision like ours have concluded that it includes any consideration sufficient to ground a contract. *See*

*Mortimer B. Burnside & Co. v. Havener Securities Corp.,* 25 A.D.2d 373, 269 N.Y.S.2d 724 (1966) (citing UCC § 2–304 generally); *Wheeler v. Sunbelt Tool Co., Inc.,* 181 Ill.App.3d 1088, 130 Ill.Dec. 863, 537 N.E.2d 1332 (applying Illinois version of UCC), *appeal denied,* 127 Ill.2d 644, 136 Ill.Dec. 610, 545 N.E.2d 134 (1989); *see also* William D. Hawkland, 2 UNIFORM COMMERCIAL CODE SERIES § 2–304:3 (1998) (stating, "the entire thrust of section 2–304 seems to be toward making the scope of Article 2 as broad as possible, limited only by due concern for the laws governing the disposition of real property.") (footnote omitted); *see also Hoffman v. Misericordia Hosp.,* 439 Pa. 501, 507–08, 267 A.2d 867, 870–71 (1970) (noting our Supreme Court has implied warranty protections in non-sales transactions, such as leases and bailments, and reversing lower court decision to dismiss warranty counts on demurrer in action involving blood transfusion). While we recognize Article 2 does not always apply simply because a transfer of goods is not a gift, *see* Pa.C.S.A. § 2304, comment 2,[7] we believe the present situation falls within the scope of the warranty provisions as intended by the drafters. *See Hoffman,* 439 Pa. at 508, 267 A.2d at 870–71 (faulting lower court for failing to consider whether the warranty policies would be furthered by their implication). This is not a situation where garbage is left on the curb for anyone to retrieve. *Contra Grigsby v. Crown Cork & Seal Co.,* 574 F.Supp. 128 (D.Del.1983) (predicting Delaware Supreme Court would find a sale

---

**6.** A true gift of a good is not a "sale" because, although title may pass between the parties to the transaction, there is no price.

**7.** Comment 2 provides:
Under subsection (1) the provisions of this Article are applicable to transactions where the "price" of goods is payable in something other than money. This does not

mean, however, that this whole Article applies automatically and in its entirety simply because an agreed transfer of title to goods is not a gift. The basic purposes and reasons of the Article must always be considered in determining the applicability of any of its provisions.

of goods under Delaware's version of UCC 2–304 but not extend Article 2 warranties in situation where defendant abandoned waste oil to plaintiff because defendant "did not warrant the merchantability or fitness of its waste ... any more than an ordinary citizen warrants the merchantability or fitness of his or her garbage at the time of a garbage collection"). Here, as Pennsy alleged:

> American Ash actively promotes the use of AggRite as a building material to be used in base course of paved structures....
>
> American Ash's technical data sheets [attached as Ex. H to the Complaint], describing AggRite, indicate that it can be used as a roadbed material meeting the requirements of PennDOT specifications.
>
> American Ash's literature [attached as Ex. H to the Complaint] also indicates that AggRite can be used as a replacement for type 2A aggregate base course material.

Compl. ¶¶ 8, 47–48. On these facts, we cannot say the law would clearly preclude recovery on Counts II, III and IV, and, accordingly, we reverse the grant of the demurrer to the extent dismissal of these counts was based on Pennsy's failure to allege a sale of goods.

¶ 15 Count V presented a claim for promissory estoppel, which the trial court dismissed upon concluding that the Complaint failed to allege either a promise or detrimental reliance on a promise. Trial Court Opinion, 5/27/05, at 9. To the extent Pennsy alleged reliance upon promises made in the promotional material for AggRite, the trial court, noting Pennsy had received such promotional material only *after* the cracking situation arose, deemed disingenuous Pennsy's attempt to cite the promotional materials as the basis for a promise or for reliance thereon. *Id.* at 9. Additionally, the trial court determined that the facts alleged "do not substantiate the existence of a promise by which American Ash *directly represented* to Pennsy (and upon which Pennsy relied) that AggRite would be suitable for the Project. The facts as pleaded instead establish that Pennsy relied on the Project Specifications which provided for AggRite use." *Id.* at 9–10 (emphasis added). While the trial court recognized that, unless American Ash had made such representations to either the project architect or the general contractor, it was unlikely the Project Specifications would have authorized use of AggRite, it nonetheless deemed unsupported by the law Pennsy's "reliance on reliance" theory. *Id.* at 10.[8]

¶ 16 "In order to maintain an action in promissory estoppel, the aggrieved party must show that 1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; 2) the promisee actually took action or refrained from taking action in reliance on the promise; and 3) injustice can be avoided only by enforcing the promise." *Crouse v. Cyclops Industries*, 560 Pa. 394, 403, 745 A.2d 606, 610 (2000). While we recognize that promissory estoppel is used to enforce a promise not otherwise supported by consideration, *see id.* at 402, 745 A.2d at 610, we nonetheless address the propriety of the trial court's dismissal of Count V should the contract claim otherwise fail.

¶ 17 Pennsy first contends the trial court erred in overlooking paragraph 49 of the

---

**8.** The trial court added, "[w]hile perhaps the Project architect or general contractor may have a claim for promissory estoppel against American Ash, such is not for the Court's consideration." *Id.* at 10.

Complaint, which alleges that American Ash directly represented AggRite's suitability for the project to Pennsy. *See* Complaint at ¶ 49 (stating "[a] representative of American Ash attended a Project meeting during which he made express assurances, as documented in a memorandum summarizing the Project meeting, that AggRite was suitable to be used as a base course on the Project."). *See also id.* at ¶ 54 (averring "American Ash communicated to Pennsy during Project meetings that the AggRite material was suitable for its intended use on the Project as roadbed material."). Paragraph 49 referenced a copy of meeting minutes attached to the Complaint. The minutes, dated 8/15/01, purported to summarize a site meeting held 8/2/01, "concerning my [John Page's] questions on the AggRite material being used for the parking sub-base."[9] The meeting thus occurred *before* Pennsy and American Ash reached agreement, *see* Compl. at ¶ 10 (referring to "on or about August 21, 2001") but *after* Pennsy entered into the subcontract with Lobar which it bid assuming use of the free AggRite.

¶ 18 That Pennsy relied in the first instance on the Project Specifications does not negate its allegation that American Ash made a direct representation to Pennsy about the suitability of AggRite for the project and that Pennsy relied on that direct representation. Even though Pennsy had already secured the subcontract, had the direct representation about the suitability of AggRite not been made it is at least conceivable that the underlying course of events may have been different. Whether American Ash should have reasonably expected to induce action or forbearance on the part of the promise through this direct representation and whether Pennsy took action or refrained from taking action in reliance on that direct representation is a matter for further discovery.

¶ 19 Furthermore, we find the trial court's reliance upon Pennsy's acknowledgement that it did not actually receive the promotional materials for AggRite until after the cracking situation occurred to support its conclusion that American Ash did not make a direct promise to Pennsy through those materials is misplaced. The argument Pennsy presents is that because it alleged that the project architect received the promotional materials and/or other explicit promises from American Ash regarding AggRite's suitability for the project and relied on those promises in issuing the Project Specifications under which Pennsy successfully bid the subcontract, its promissory estoppel claim is viable. We agree.

¶ 20 In *Artkraft Strauss Sign Corp. v. Dimeling,* 429 Pa.Super. 65, 631 A.2d 1058 (1993), this Court permitted Artkraft, who relied upon representations made by one Levin to Classic (an investment partnership) regarding the authority of another entity (Kelly Operating Co.) to enter a sublease in a situation where Classic in turn contacted with Artkraft to design, construct and paint a sign, to recover in promissory estoppel from Levin. We explained that Levin's failure to inquire into Kelly's authority to make the sublease coupled with his subsequent active representations to the other parties that Kelly did possess such authority, "constitutes sufficient grounds to invoke equitable relief and supports invoking both equitable and promissory estoppel." *Id.* at 1062. We further explained that it was Levin's actions, more than any other party, which

---

9. The record does not identify John Page. We can only assume based on Pennsy's representations in its brief that someone directly connected to Pennsy was present at the meeting. *See* Appellant's Brief at 17.

resulted in the losses borne by Artkraft. *Id.*

¶ 21 Further, "[t]he doctrine [of promissory estoppel] embodied in [§ ] 90 of the Restatement (Second) of Contracts ... is the law of Pennsylvania," *Central Storage & Transfer Co. v. Kaplan,* 487 Pa. 485, 489, 410 A.2d 292, 294 (1979), and that section provides in relevant part:

(1) A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee *or a third person* and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

(emphasis added). Application of this section, while clearest in the case of an intended third party beneficiary, is not limited to such. *See* MURRAY ON CONTRACTS § 66.B.2, at 281 ("The Restatement 2d version of § 90, however, would also permit a recovery by a third party who justifiably relies [on the promise made to the promisee] even though such party is not an intended beneficiary"). Where clear justifiable reliance by the third party is shown, courts have been willing to endorse the broad reach of Section 90. *See Masonry v. Miller Construction,* 558 So.2d 433 (Fla. App.1990) (holding subcontractor's insurer was estopped from denying coverage under policy erroneously issued to subcontractor where general contractor relied on the policy as proof of subcontractor's worker's compensation coverage in permitting subcontractor on the job-site and where general contractor's insurance sought reimbursement from subcontractor's insurer for payment made to injured employee of subcontractor). Thus, the law does not clearly prohibit recovery in promissory estoppel on the facts alleged. Accordingly, we reverse the dismissal of Count V.

¶ 22 For all of the foregoing reasons, we reverse the trial court's order granting the demurrers and dismissing the Complaint and remand for further proceedings. Jurisdiction relinquished.